**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ERIKA BROWN, LISA SATCHEL, KENNETH BREWER, and PHYLLIS GRAY on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br>        v. <br><br> WALGREENS BOOTS ALLIANCE, INC., <br><br>        Defendant. | Case No. 1:18-cv-7585 |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF FACTUAL ALLEGATIONS. ........................................... 3

III.  LEGAL STANDARD OF REVIEW ........................................................... 5

IV.  ARGUMENT ...................................................................................... 6

     A.    Plaintiffs' Claims Are Expressly Preempted by Federal Law. ............................. 6

          1.    The National Uniformity for Nonprescription Drugs Statute Expressly Preempts Plaintiffs' Claims........................................................... 6

          2.    There Is an Extensive Federal Regulatory Scheme Governing OTC Drugs. ......................................................................................... 9

               a.    The FDA Monograph .................................................................. 10

               b.    FDA Guidance .......................................................................... 12

               c.    The USP Dissolution Standards for Acetaminophen Immediate Release Tablets .......................................................... 13

               d.    FDA Enforcement of Misbranded OTC Drugs............................ 14

               e.    FTC Enforces OTC Drug Advertising.......................................... 16

     B.    Plaintiffs' Claims Should Be Dismissed Under the Doctrine of Primary Jurisdiction........................................................................................... 16

     C.    Plaintiffs Fail to State a Claim Under State Consumer Protection Statutes. ........ 17

     D.    Illinois's Safe Harbor Doctrine Bars Plaintiffs' Claims ...................................... 22

     E.    Plaintiffs Fail to State a Claim for Breach of Implied and Express Warranty. ............................................................................................... 23

     F.    Plaintiffs' Remaining Claims Must Also Be Dismissed...................................... 25

V.   CONCLUSION................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alam v. Miller Brewing Co.*,
709 F.3d 662 (7th Cir. 2013) ................................................. 5

*Aliano v. Fifth Generation, Inc.*,
No. 14 C 10086, 2015 U.S. Dist. LEXIS 128104 (N.D. Ill. Sept. 24, 2015)........................... 25

*Alizadeh v. Tellabs, Inc.*,
No. 13 C 537, 2015 U.S. Dist. LEXIS 15553 (N.D. Ill. Feb. 9, 2015).................................. 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................. 5, 17

*Baldwin v. Star Scientific, Inc.*,
No. 14 C 588, 2016 U.S. Dist. LEXIS 11952 (N.D. Ill. Feb. 2, 2016).................................... 21

*Bober v. Glaxo Wellcome Plc*,
246 F.3d 934 (7th Cir. 2001) ................................................. 18, 19, 22

*Bowling v. Johnson & Johnson*,
65 F. Supp. 3d 371 (S.D.N.Y. 2014) ................................................. 9, 10, 25

*Carter v. Novartis Consumer Health, Inc.*,
582 F. Supp. 2d 1271 (C.D. Cal. 2008) ................................................. 8

*Cipollone v. Liggett Group, Inc.*,
505 U.S. 504 (1992)................................................. 6

*Classic Bus. Corp. v. Equilon Enters., LLC*,
No. 09 C 7735, 2011 U.S. Dist. LEXIS 7817 (N.D. Ill. Jan. 27, 2011) ................................. 25

*Cleary v. Phillips Morris, Inc.*,
656 F.3d 511 (7th Cir. 2011) ................................................. 25

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)................................................. 6

*Curran v. Bayer Healthcare LLC*,
No. 17 C 7930, 2018 U.S. Dist. LEXIS 89437 (N.D. Ill. May 30, 2018) ................................ 8

*Degelmann v. Advanced Medical Optics, Inc.*,
659 F.3d 835 (9th Cir. 2011), *vacated pursuant to settlement* ........................................... 12, 13

*I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
502 U.S. 183 (1991)................................................. 7

*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*,
  275 F. Supp. 3d 910 (N.D. Ill. 2017) .................................................................. 23, 24

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
  142 F. Supp. 3d 747 (N.D. Ill. 2015) .......................................................................... 12

*In re Thompson Medical Co.*,
  104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) .................................. 16

*Kanfer v. Pharmacare US, Inc.*,
  142 F. Supp. 3d 1091 (S.D. Cal. 2015) ........................................................................ 6

*Miller v. Showcase Homes, Inc.*,
  No. 98 C 2009, 1999 U.S. Dist. LEXIS 4748 (N.D. Ill. 1999) .................................. 24

*Mills v. Warner-Lambert*,
  581 F. Supp. 2d 772 (E.D. Tex. 2015) ........................................................................ 10

*Naimi v. Starbucks Corp.*,
  LACV 17-6484 VAP (GJSx), 2018 U.S. Dist. LEXIS 110398 (C.D. Cal. June 27,
  2018) ...................................................................................................................... 20, 21

*Padilla v. Costco Wholesale Corp.*,
  No. 11 C 7686, 2013 U.S. Dist. LEXIS 7990 (N.D. Ill. Jan. 16, 2013) .................... 20

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312 (2008) ....................................................................................................... 8

*Schiesser v. Ford Motor Co.*,
  No. 16 C 730, 2017 U.S. Dist. LEXIS 53180 (N.D. Ill. Apr. 6, 2017) ................. 24, 25

*Smith-Victor Corp. v. Sylvania Electric Products, Inc.*,
  242 F. Supp. 302 (N.D. Ill. 1965) ............................................................................... 20

*Spector v. Mondelez Int'l Inc.*,
  No. 15 C 4298, 2017 U.S. Dist. LEXIS 158140 (N.D. Ill. Sept. 27, 2017) ...... 17, 18, 19, 21, 22

*Tullis v. DeTella*,
  No. 98 C 352, 1999 U.S. Dist. LEXIS 1575 (N.D. Ill. Feb. 10, 1999) ........................ 5

*Turek v. General Mills*,
  754 F. Supp. 2d 956 (N.D. Ill. 2010) ......................................................................... 6, 7

*Tutoki v. Celebrezze*, 375 F.2d 105 (7th Cir. 1967) ............................................... 16, 17

*Vincent v. Medtronic, Inc.*,
  221 F. Supp. 3d 1005 (N.D. Ill. 2016) .......................................................................... 5

iii

*Weinberger v. Bentex Pharmas., Inc.*,
  412 U.S. 645 (1973) ............................................................................ 10

*Williamson v. Curran*,
  714 F.3d 432 (7th Cir. 2013) ............................................................... 5

**Statutes**

21 U.S.C. § 352(a) ............................................................................ 9, 14, 15

21 U.S.C. § 379r ................................................................................. *passim*

815 Ill. Comp. Stat. 505 ..................................................................... *passim*

FDCA § 30k(a) ................................................................................... 8, 9

FDCA § 501(b) ................................................................................... 14

FDCA § 502 ....................................................................................... 9b 14, 15

Mo. Rev. Stat. § 407.010 ................................................................... 21

UCC § 2-314(2) .................................................................................. 23

**Regulations**

21 C.F.R. § 210.66 ............................................................................. 9

21 C.F.R. § 299.5 ............................................................................... 14

21 C.F.R. § 330 .................................................................................. 1, 9, 10, 11

21 C.F.R. § 343 .................................................................................. 11, 14

**Rules**

Rule 9(b) ............................................................................................ 19, 21

Rule 12(b)(6) ..................................................................................... 5, 21

Rule 12(f) ........................................................................................... 19

**Other Authorities**

FAQs: USP and its Standards, U.S. Pharmacopeia,
http://www.usp.org/frequently-asked-questions/usp-and-its-standards............................13, 14

Fourth Interim Revision Announcement <711> Dissolution, U.S. Pharmacopeia
(last revised November 21, 2016),
https://www.usp.org/sites/default/files/usp/document/harmonization/gen-
method/q01_pf_ira_33_4_2007.pdf.................................................................................11, 13

Kaury Kucera, Amber Jessop, Niuska Alvarez, David Gortler, David Light, *Rapid
and Fast-Release Acetaminophen Gelcaps Dissolve Slower Than
Acetaminophen Tablets*, Adv Inv Pha The Medic, 1:63-71 (Nov. 12, 2018) ................. *passim*

U.S. Dept. of Health and Human Services Food and Drug Administration,
Dissolution Testing and Acceptance Criteria for Immediate-Release Solid
Oral Dosage Form Drug Products Containing High Solubility Drug
Substances, Guidance for Industry (Aug. 2018)................................................................12, 13

U.S. Dept. of Health and Human Services Food and Drug Administration, Waiver
of In Vivo Bioequivilance Studies for Immediate-Release Solid Oral Dosage
Forms Based on a Biopharmaceutics Classifications System, Guidance for
Industry (December 2017) ................................................................................................12, 13

U.S. Food and Drug Andministration, *Drug Monograph Process*, available at
https://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelop
edandapproved/ucm317137.htm ..........................................................................................10

U.S. Food and Drug Administration, OTC Warning Letters,
https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Enfo
rcementActivitiesbyFDA/ucm285283.htm#internal...............................................................14

Warning Letter, 2015-17, American Family Pharmacy, LLC 7/30/15,
https://www.fda.gov/ICECI/
EnforcementActions/WarningLetters/2015/ucm470016.htm...........................................11, 14

Warning Letter, FLA-07-02, Direct Dispensing, Inc., 11/02/06,
https://wayback.archive-
it.org/7993/20170112201616/http://www.fda.gov/ICECI/EnforcementActions
/WarningLetters/2006/ucm076153.htm ...................................................................................15

## I.  INTRODUCTION

When a product label contains true statements that comply with federally mandated standards which govern the claims at issue, courts consistently hold the label is not false, misleading, or deceptive.  Plaintiffs Erika Brown, Lisa Satchel, Kenneth Brewer, and Phyllis Gray ("Plaintiffs") filed this proposed class action on behalf of themselves and a putative class consisting of others in Illinois, Missouri, and New York who purchased Walgreens brand Over-the-Counter ("OTC") extra strength acetaminophen gelcaps (the "Walgreens Products"). Plaintiffs' First Amended Complaint ("FAC") asserts a veritable laundry list of claims against Walgreens Boots Alliance, Inc. ("Walgreens") for: (1) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"); (2) violation of the Missouri Merchandising Practices Act (the "MMPA"); (3) violations of the New York Deceptive Sales Practices Act (the "NYCFA"); (4) breach of implied warranty of merchantability; (5) breach of express warranty; (6) breach of the Magnuson-Moss Warranty Act (the "MMWA"); (7) unjust enrichment; and; (8) declaratory and injunctive relief for product recalls, new labels, and various notifications to consumers.  The crux of Plaintiffs' FAC is that consumers, like them, who purchased the Walgreens Products were tricked into believing that they were getting the "quickest" and "fastest" dissolving acetaminophen product available because of the use of the words "Rapid Release" or "fast-release" on the Walgreens Products' package labeling.

Plaintiffs' claims, however, are subject to dismissal for several reasons.  First, they are expressly preempted by federal statute—the National Uniformity for Nonprescription Drugs provision of the Food and Drug Administration ("FDA") Modernization Act of 1996, 21 U.S.C. § 379r.  Section 379r prohibits any state requirement that "relates to the regulation of" OTC drugs that "is in addition to, or not identical with" federal regulations governing OTC drugs. There exists an extensive federal regulatory scheme, enacted by FDA, governing every aspect of OTC medication, including regulations regarding the labeling and branding of OTC drugs.  *See* 21 C.F.R. Part 330.  The regulatory scheme sets forth dissolution standards for acetaminophen products that establish that the Walgreens Products more than meet the FDA's requirements for

1

what dissolution rate constitutes a rapidly dissolving acetaminophen gelcap or tablet such that they can lawfully be labeled as "rapid release."  Plaintiffs' claims would require an OTC drug to be the *fastest* release requirement to use this term, thereby adding additional and/or different requirements to the labeling of OTC drugs than those required by federal law.  Accordingly, Plaintiffs' claims are expressly preempted by Section 379r.[1]  In addition, the FTC is responsible for monitoring and enforcing OTC drug labeling.

Second, Plaintiffs' claims under the ICFA, MMPA, and NYCFA have several glaring deficiencies that subject them to dismissal under both Rules 12(b)(6) and 9(b).  For example, Plaintiffs' allegations that the Walgreens Products represent that they work faster than Walgreens' non-rapid release products (FAC, ¶¶ 10-11, 16, 57, 65, 69, 74, 77) are contradicted by the challenged Walgreens Products labels themselves, which contain no comparative claims or make any affirmative representations that Walgreens Products work faster than any other product.  Likewise, Plaintiffs' allegations that the use of the term "Rapid Release" or "fast-release" on the Walgreens Products packaging is false and deceptive is directly undercut by the study cited by Plaintiffs as the basis for their claims, which shows that the Walgreens Products easily meet the FDA's standards and guidance for rapidly dissolving acetaminophen gelcaps.[2]

Unable to show deception, Plaintiffs try to bring a substantiation claim, but the FAC contains no allegation that Walgreens cannot substantiate the Rapid Release claims on the labels, and the Study cited by Plaintiffs actually provides such substantiation.  In any event, Plaintiffs have no standing to bring a substantiation claim.  Additionally, Illinois's safe harbor doctrine also bars Plaintiffs from imposing state law liability because Walgreens has fully complied with

---

[1] If the Court finds that Plaintiffs' claims are not preempted, the FAC should be dismissed under the doctrine of primary jurisdiction.  See text infra at IV.B.

[2] A gelcap is a capsule-shaped tablet that is encased or coated in gelatin or a similar substance.  *See* Kucera, Jessop, Alvarez, Gortler, Light, *Rapid and Fast-Release Acetaminophen Gelcaps Dissolve Slower Than Acetaminophen Tablets*, Adv Inv Pha The Medic, 1:63-71 (Nov. 12, 2018) accessible at http://www.kenkyugroup.org/article/8/173/Rapid-and-Fast-Release-Acetaminophen-Gelcaps-Dissolve-Slower-Than-Acetaminophen-Tablets (last accessed February 4, 2019) (the "Study") (attached as Exhibit 1) (for "acetaminophen, coated capsule-shaped tablets, or caplets, are commonly marketed as gelcaps.").  Some customers prefer tablets, others prefer gelcaps because they are easier to swallow.

FDA regulations in labeling Walgreens Products as "rapid release" or "fast-release."

Finally, while Plaintiffs' state warranty claims are preempted, those claims, and their federal Magnuson-Moss Warranty Act claim, should be independently dismissed because Plaintiffs have not plausibly alleged that Walgreens made any warranty with which the Walgreens Products did not comply. Plaintiffs' claims for unjust enrichment and declaratory and injunctive relief are derivative and duplicative of their other claims and similarly flawed such that they should be dismissed.

The deficiencies in Plaintiffs' FAC are significant and cannot be cured through creative pleading. Accordingly, for all these reasons and others detailed below, Walgreens' motion to dismiss should be granted in its entirety with prejudice.

## II.      STATEMENT OF FACTUAL ALLEGATIONS.
### A.      The Parties

Walgreens is a large retailer that sells different types of products, including Walgreens brand OTC extra strength acetaminophen gelcaps. (Dkt. 13 (FAC), ¶¶ 1-2, 6-7.) Plaintiff Brown purchased one of the Walgreens Products from a Walgreens store in Cook County, Illinois to treat back pain and occasional headaches. (*Id.* at ¶¶ 79-81.) Plaintiff Satchel purchased one of the Walgreens Products from "a local Walgreens store in Illinois" at the advice of her doctor, in order to treat arthritis. (*Id.* at ¶¶ 87-90.) Plaintiff Brewer purchased one of the Walgreens Products from "his local Walgreens in Missouri" to treat chronic pain. (*Id.* at ¶¶ 96-98.) Plaintiff Gray purchased one of the Walgreens Products from "a local Walgreens in New York" to treat headaches. (*Id.* at ¶¶ 104-106.)

### B.      Key Allegations

Plaintiffs allege that Walgreens sells extra strength acetaminophen gelcap products using the words "Rapid Release" or "fast-release" on the package labels. (FAC, ¶¶ 6-7.) The package

labels, as shown in the FAC, do not make any comparative claims or other affirmative representations that Walgreens Products work faster than any other acetaminophen products. (*Id.*at ¶¶ 6-7, 62-63.)  Plaintiffs allege in conclusory fashion that Walgreens falsely represents that the Walgreens Products work faster than its non-rapid release products.  (*Id.* at ¶¶ 9, 15, 50, 63, 68, 71, 77.)  The product labels, however, make no such statement.  (*See id.* at ¶¶ 6-7, 62-63.)

Plaintiffs' claims against Walgreens are premised on a November 12, 2018 study entitled "Rapid and Fast-Release Acetaminophen Gelcaps Dissolve Slower Than Acetaminophen Tablets," which is cited in the FAC.  (*Id.* at ¶ 12, n. 8.)  The Study found the Walgreens Products achieve an 80% dissolution rate in an average of 8.73 minutes.  (*See* Study.)  The Study "follow[ed] the USP monograph for acetaminophen dissolution…which specifies tolerance as greater or equal to 80% dissolution within 30 minutes."  (*Id.*)  The Study concluded that the Walgreens Products "passed industry standards for full dissolution in under 30 minutes."  (*Id.*) Finally, the Study explains that products which dissolve in under 30 minutes, like the Walgreens Products, are "generally considered rapidly dissolving."  (*Id.*)  As documented by the Study, the Walgreens Acetaminophen gelcaps easily meet FDA's requirements for a "Rapid Release" label.

Plaintiffs also seek to hold Walgreens liable for intentional concealment.  (FAC, ¶¶ 16, 137, 147.)  They allege Walgreens should have disclosed to consumers that the Walgreens Products work slower than Walgreens' other non-rapid release acetaminophen products.  (*Id.* at ¶ 137.)  Plaintiffs also attempt to bootstrap a claim for false advertising against Walgreens based on advertisements and claims made by Johnson & Johnson ("J&J") about its Rapid-Release Tylenol products, rather than statements made by Walgreens.  (*Id.* at ¶¶ 31-47.)  However, J&J is not a party to this litigation, and those statements do not relate to the Walgreens Products. Plaintiffs' efforts to hold Walgreens responsible for J&J's statements simply because the Walgreens Products claim to have the same active ingredient—acetaminophen—and when there are no allegations that Plaintiffs even saw the alleged J&J promotional statements, much less

relied on them, illustrates the insufficiency of Plaintiffs' claims against Walgreens.[3]

## III.  LEGAL STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In reviewing the FAC, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678.  "To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief."  *Vincent v. Medtronic, Inc.*, 221 F. Supp. 3d 1005, 1007 (N.D. Ill. 2016).

The Court also need not "accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).  So too, this Court "need not accept as true allegations that are contradicted by attachments to the complaint."  *Tullis v. DeTella*, No. 98 C 352, 1999 U.S. Dist. LEXIS 1575, at *16 (N.D. Ill. Feb. 10, 1999).  In addition, courts in the Seventh Circuit

> have taken a broader view of documents that may be considered on a motion to dismiss, noting that a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the compliant, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice.

*Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  Moreover, for the purposes of a motion to dismiss, courts have judicially noticed FDA guidance documents available on government agency websites. *See Vincent*, 221 F. Supp. 3d at 1009 (judicially noticing "publicly-available government agency determinations that appear on an agency website").[4]

---

[3] *Compare id.* at ¶ 8 (alleging the Walgreens Products "are marketed as comparable to Tylenol Extra Strength Rapid Release Gels") *and id.* at ¶ 60 (alleging the Walgreens Products' packaging "associates its products with the Tylenol products") *with id.* ¶¶ 55-56 (showing the packaging only states that active ingredients of certain products are comparable).

[4] The FDA Guidance documents governing the Walgreens Products at issue are readily accessible on the FDA website and therefore may be judicially noticed.  Similarly, the FDA enforcement letters cited herein are official government documents that are readily accessible on the FDA website, and the Court should take judicial notice of

In this case, the FAC plainly refers to and relies upon the Study and the Walgreens Products labels. (See FAC at ¶¶ 6-7, 12, 29-30, 48, 62-63, 70.) These documents are not only central to Plaintiffs' claims; they form the entire basis for Plaintiffs' case. Accordingly, as part of this Motion, Walgreens requests that the Court take judicial notice of the Study, the Walgreens Product labels, and the FDA Guidance documents and warning letters cited herein.

## IV. ARGUMENT

### A. Plaintiffs' Claims Are Expressly Preempted by Federal Law.

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; …any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). State law is preempted if federal law "express[ly]" preempts it. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Plaintiffs' claims are expressly preempted by the National Uniformity for Nonprescription Drugs provision of the FDA Modernization Act, 21 U.S.C. § 379r.

#### 1. The National Uniformity for Nonprescription Drugs Statute Expressly Preempts Plaintiffs' Claims.

The express preemption provision of the National Uniformity for Nonprescription Drugs Statute, 21 U.S.C. § 379r(a), provides that:

> [N]o State or political subdivision of a State may establish or continue in effect any requirement –
> (1)    that *relates to the regulation of a drug that is not subject to the requirements of Section 353(b)(1) or 353(f)(1)(A) of this Title* [5] *[i.e., OTC drugs including the Walgreens products]*; and
> (2)    that is *different from or in addition to, or that is otherwise not identical with, a requirement* under [the FDCA] ….

*Id.* (emphasis added). The intent and language of § 379r is clear, and unambiguously preempts state law that relates to the regulation of OTC drugs, including the Walgreens Products. *See*

---

these documents, too. *See, e.g. Kanfer v. Pharmacare US, Inc.*, 142 F. Supp. 3d 1091, 1099 (S.D. Cal. 2015) (finding FDA Warning letters available on the FDA's website appropriate for judicial notice).
[5] Section 353(b)(1) deals with dangerous prescription drugs which require medical professional supervision, while Section 353(f) covers veterinary prescription drugs.

*Turek v. General Mills*, 754 F. Supp. 2d 956, 961 (N.D. Ill. 2010).  Congress's intent is also expressed in the statute's heading: "National Uniformity for Nonprescription Drugs."  *See I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 189 (1991) (holding that a section's title can aid in its interpretation).  Congress's express policy in § 379r in favor of "national uniformity" would be defeated if courts or juries in each state could decide for themselves whether to disregard the FDA's requirements for what dissolution rate constitutes a rapidly dissolving acetaminophen gelcap/tablet.  As long as the requirement is "in addition to" or "not identical to" FDA regulations, it is preempted.  *See Turek*, 754 F. Supp. 2d at 959-61. Accordingly, Plaintiffs' claims are preempted under section 379r.

First, Plaintiffs' claims unquestionably "relate to the regulation" of an OTC drug. Plaintiffs' claims are premised on the labeling of an OTC drug: acetaminophen.  That is the exact area of regulation encompassed by the FDA regulatory scheme described below.

Second, Plaintiffs' claims would have the ICFA, MMPA, NYCFA, MMWA, and the Uniform Commercial Code (the "UCC") set out additional and different labeling requirements and standards for the OTC drug at issue here.  Importantly, for express preemption under Section 379r for the claims asserted here, it is not required for a defendant to show that it would be impossible to comply with both the federal law and the state law. [6]  Instead, all that is required is to show that the purported state law requirements would be "in addition to," or "not identical to" the federal requirement.  According to Plaintiff, Walgreens' labeling of the Walgreens Products is false, misleading and/or deceptive.  For this to be the case, these statutes would apparently require an OTC drug to be the *fastest* release requirement, in order to utilize a label bearing the

---

[6] Notably, Section 379r contains a carve-out for products liability claims.  Therefore, a defendant seeking to preempt a state law products liability claim would have to show "conflict" or "impossibility" preemption, *i.e.*, that it would be impossible to comply with both the FDA labeling requirements and the state law's requirements.

term "rapid release," or require the label to say "rapid release but other products may be more rapid." Indeed, Plaintiffs' Prayer for Relief requesting "Walgreens to adequately represent the true nature, quality, and capability of the" Walgreens Products, as well as seeking an order for "a nationwide recall" and the issuance of "warnings and/or notices to consumers" regarding the Walgreens Products' qualities[7] demonstrates the degree to which Plaintiffs' claims impermissibly intrude on an area that Congress empowered FDA to regulate.

Thus, there can be no doubt that the state law claims asserted by Plaintiffs would add additional and/or different requirements to the labeling of OTC drugs than those required by the federal regulatory scheme. Such an express preemption extends beyond state regulations and regulatory actions, and covers both common law and state law claims by private plaintiffs. In *Curran v. Bayer Healthcare LLC*, No. 17 C 7930, 2018 U.S. Dist. LEXIS 89437 (N.D. Ill. May 30, 2018), this Court dismissed a complaint after finding all of the plaintiff's claims were preempted by section 379r. In *Curran*, the plaintiff challenged a sunscreen's claim of "SPF 30" based on testing from a Consumer Reports article. *Id.* at *2. The court ruled that to the extent the plaintiff's claim was to require the defendant to amend its label to reflect the results of this independent test, that would be different from or in addition to FDA requirements, and thus was preempted. *Id.* at *8-9; *see also Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp. 2d 1271, 1283 (C.D. Cal. 2008) (granting a motion to dismiss based on preemption pursuant to section 379r and noting the critical analysis is the *effect* that a finding of liability would have, "not the particular common law or state law theory upon which the claim was brought."); *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) (plaintiff's state law claims based on, *inter alia*, a defendant's marketing and sale of a medical device were expressly preempted under § 30k(a) of

---

[7] FAC. at p. 31.

the FDCA, a parallel preemption statute virtually identical to § 379r for medical devices).

Further demonstrating the broad preemptive effect of section 379r is *Bowling v. Johnson & Johnson*, where plaintiffs brought state law claims that were not identical to the federal standards. 65 F. Supp. 3d 371, 375 (S.D.N.Y. 2014). The plaintiffs brought an action based on Listerine's representation that using it "restores enamel." *Id*. at 376. The FDA had not prohibited such a label. *See id*. The court found preemption appropriate when a state law prohibits labeling permitted by federal law, and even when it varies *at all* from federal law. *See id*. Based on section 379r and the FDA monograph applicable in *Bowling*, the court found these claims to be expressly preempted. *See id*. In this highly regulated area, "[i]t is up to the FDA" to decide what is false and misleading, not the Court. *See id*. at 377. Applying the express preemption provisions of section 379r, Plaintiffs' claims are preempted and should be dismissed.

2.     There Is an Extensive Federal Regulatory Scheme Governing OTC Drugs.

The Food, Drug and Cosmetic Act (the "FDCA") prohibits the misbranding of drugs, FDCA § 502(a), 21 U.S.C. § 352(a), and the FDA regulates the labeling of OTC drugs. In particular, 21 C.F.R. § 201.66 contains extensive regulations regarding OTC drug labeling, and applies to "the content and format requirements for the labeling of all OTC drug products. Where an OTC drug product is the subject of an applicable monograph or regulation that contains content and format requirements that conflict with this section, the content and format requirements in this section must be followed unless otherwise specifically provided in the applicable monograph or regulation." 21 C.F.R. § 210.66(a). These requirements apply to all OTC drug "labeling." 21 C.F.R. § 210.66(a), (c), (d). Thus, there exists an extensive federal regulatory scheme enacted by FDA governing every aspect of OTC medication.

Federal regulations have the force of binding federal law and thus, any state law that is inconsistent or distinct from a federal regulation is preempted. The Code of Federal Regulations contains a detailed section on OTC drugs which are generally recognized as safe, effective and not misbranded. *See* 21 C.F.R. Part 330, titled "Over-The-Counter (OTC) Human Drugs which

are generally recognized as Safe and Effective." Under the FDA regulations, the labeling on an OTC drug must be clear, truthful, and neither false nor misleading so that an ordinary individual can understand the meaning. *See id.* at (a)(4)(v). Any product that does not conform to the approved specifications is subject to regulatory enforcement action. *See id.* at 330.10(b).

Additionally, FDA has regulated the Walgreens acetaminophen gelcaps through a tentative final monograph and official FDA guidance. Furthermore, the tentative final monograph incorporates the dissolution testing methodology and dissolution standards for acetaminophen Immediate Release Tablets[8] contained in the USP, as explained below.

a. *The FDA Monograph*

As part of its regulation of OTC drugs, FDA issues regulations called monographs.[9] Monographs are applicable to non-prescription drugs such as the Walgreens Products at issue here. After going through a detailed review and public rulemaking process, the FDA publishes its conclusions in the Federal Register,[10] at which point the OTC drug monographs are regulations of the FDA and thus enforceable by FDA. *Weinberger v. Bentex Pharmas., Inc.*, 412 U.S. 645, 650-51 (1973). An OTC drug sold pursuant to a monograph must meet "each of the conditions continued in any applicable monograph." 21 C.F.R. § 330.1. Courts have ruled that FDA monographs have preemptive effect against state law. *See, e.g. Mills v. Warner-Lambert,* 581 F. Supp. 2d 772, 787 (E.D. Tex. 2015) (holding a plaintiff's claims regarding the labeling of OTC drugs were preempted by the FDA monograph); *see also Bowling,* 65 F. Supp. 3d. at 378 (same). Additionally, FDA has brought enforcement actions on the basis of monographs, as detailed below in section A.2.d of this Memorandum.

The FDA issued a tentative final monograph for OTC drugs that contain acetaminophen

---

[8] As noted in n.1, *supra*, gelcaps are simply tablets that are coated in gelatin or a similar substance, and are subject to the same dissolution testing methodology and standards as all Immediate Release tablets.
[9] U.S. Food and Drug Administration, *Over-the-Counter (OTC) Drug Monograph Process*, available at https://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/ucm317137.htm (last accessed February 4, 2019).
[10] *Id.*

in 1988. *See* 21 C.F.R. § 343 ("Internal Analgesic, Antipyretic, and Antirheumatic Drug Products for Over-the-Counter Human Use") (the "1988 TFM"). A tentative final monograph establishes "conditions under which a category of OTC drugs or specific OTC drugs are generally recognized as safe and effective and not misbranded." 21 C.F.R. § 330.10(a)(7). Objections to the tentative final monograph must be submitted within 12 months of it being published and an oral committee hearing is held. *See* 21 C.F.R. §§ 330.10(a)(7)(iii), (a)(8). Subsequently, a final monograph is typically published after a review of the record. *See* 21 C.F.R. § 330.10(a)(9). Any product that does not conform "to an applicable monograph after its effective date is liable to regulatory action." 21 C.F.R. § 330.10(b). While the FDA has not issued a final monograph for OTC acetaminophen products, *a tentative final monograph such as the 1988 TFM has the force and effect of a final monograph.* This is because FDA regulations state that when an over the counter drug monograph "has not been finalized and finalization is not imminent…the agency may publish a notice of enforcement policy that allows marketing to begin pending the completion of the final monograph…." 21 C.F.R. § 330.14(h). Indeed, the 1988 TFM has been treated as an enforceable legal requirement by FDA. *See* American Family Pharmacy Warning Letter, discussed in section A.2.d below.

The 1988 TFM specifies requirements for the active ingredients (§ 343.10), labeling (§ 343.50), labeling of permitted combinations of active ingredients (§ 343.60), professional labeling (§ 343.80), and testing procedures (§ 343.90). According to the 1988 TFM, labels are required to state the product's identity, list appropriate indications as provided in the monograph, label for children, and include warnings and directions. *See* 21 C.F.R. § 343.50. Most importantly here, the 1988 TFM requires the testing procedures for acetaminophen and aspirin tablets to meet the dissolution standard as contained in the USP, which are described below. *See* Fourth Interim Revision Announcement <711> Dissolution, U.S. Pharmacopeia (last revised Nov. 21, 2016), available at https://www.usp.org/sites/default/files/usp/document/harmonization/gen-method/q01_pf_ira_33_4_2007.pdf (last accessed February 4, 2019).

b. *FDA Guidance*

FDA has also regulated the testing methodology and dissolution standards for OTC acetaminophen tablets through two FDA guidances. These guidances are Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances, Guidance for Industry, U.S. Dept. of Health and Human Services Food and Drug Administration (Aug. 2018) (the "Dissolution Testing Guidance") (attached as Exhibit 2); and the Waiver of In Vivo Bioequivilance Studies for Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classifications System (December 2017) ("Waiver of In Vivo Immediate-Release Guidance") (attached as Exhibit 3).

An FDA guidance contains the FDA's detailed description of the federal law, and such guidance has been interpreted by courts to preempt state law. *See Degelmann v. Advanced Medical Optics, Inc.*, 659 F.3d 835 (9th Cir. 2011) *vacated pursuant to settlement*; *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 142 F.Supp.3d 747 (N.D. Ill. 2015). In *Degelmann*, applicable FDA guidance addressed specific requirements for contact lens solutions to be called a "disinfecting" solution. *See Degelmann*, at 841-42. The contact lens solution met the FDA requirements for "disinfecting" contained in the guidance. *Id.* at 842. The plaintiff in *Degelmann* alleged that the product's packaging and labeling was false and misleading because the solution did not disinfect against a certain strain of bacteria. *Id.* The Ninth Circuit found that a requirement that the product must meet an additional standard in order to utilize the term "disinfecting" would necessarily mean the California state laws "would have a requirement that is additional to the federal requirements." *Id.* Thus, the Ninth Circuit found that the state consumer protection claims were preempted. *See also In re Testosterone Replacement Therapy Prods.* at 754 (granting motion to dismiss where the court relied on the FDA's labeling guidance in ruling that manufacturers are prohibited from altering warning labels under federal law).

Courts have interpreted FDA guidance to establish legally enforceable requirements.

*See, e.g. Degelmann*, 659 F.3d at 842.  The Dissolution Testing Guidance establishes the standard dissolution methodology and criteria for highly soluble drug substances.  *See id*. at 2. The Dissolution Testing Guidance states that in order for oral drug products with a high solubility to be considered "immediate release," the dissolution rate must be 80% in 30 minutes. *See id*. at 5.  Further FDA guidance on solubility testing and standards is contained in the Waiver of In Vivo Immediate-Release Guidance, which defines an acetaminophen tablet as being "rapidly dissolving" when a mean of 85% or more of the drug substance dissolves within 30 minutes.  *See id*. at 3.  Such a product is considered "very rapidly dissolving" if a mean of 85% or more dissolved within 15 minutes.  *See id*.  This Guidance explains how to determine a substance's permeability class and dissolution characteristics, in addition to what data supports high solubility, permeability and rapid release.  *See id*. at 5-9, 13-14.

Thus, while the FAC alleges that the Walgreens Products are falsely labeled as "Fast-Release" or "Rapid Release," this allegation is contradicted by the FDA standards.  The Walgreens Products easily comply with these FDA requirements, as according to the Study relied on in Plaintiffs' FAC, the Walgreens Product tested averaged the 80% dissolution within just over nine (9) minutes—more than three times faster than the rate required by the FDA.

        c.    *The USP Dissolution Standards for Acetaminophen Immediate Release Tablets*

The 1988 TFM specifically references and incorporates the USP[11] provisions for the testing methodology and standards for immediate release acetaminophen tablets.  The USP dissolution testing information provides specifications for the testing apparatus, testing procedures, and accepted release times for immediate, extended, and delayed release products.[12]

When a drug complies with USP standards, it necessarily meets all the requirements

---

[11] USP is a non-profit, independent organization that sets standards for drugs, dietary supplements and food ingredients *See* FAQs: USP and its Standards, U.S. Pharmacopeia, http://www.usp.org/frequently-asked-questions/usp-and-its-standards (last visited: January 7, 2019) ("USP FAQ").

[12] *See* Fourth Interim Revision Announcement <711> Dissolution, U.S. Pharmacopeia (last revised November 21, 2016),  https://www.usp.org/sites/default/files/usp/document/harmonization/gen-method/q01_pf_ira_33_4_2007.pdf.

stated in the article's monograph, applicable General Chapters, and General Notices. *See* USP FAQ. Additionally, Congress has given USP standards a role in certain misbranding provisions of the FDCA.[13] *See id.* The USP is the authoritative standard upon which products are held to a minimum standard, unless the FDA has instituted a stricter specification. According to the Study, the Walgreens Products meet the USP standards for immediate release acetaminophen tablets. Because Plaintiffs' claims purport to regulate OTC drugs, and because they would require something more than the FDA regulatory scheme for OTC drugs, Plaintiffs' FAC is expressly preempted by the National Uniformity for Nonprescription Drugs Statute.

### d. FDA Enforcement of Misbranded OTC Drugs

Using its authority under the FDCA, FDA regulations, the TFM and the USP dissolution standards, FDA enforces violations of misbranded OTC internal analgesics, including acetaminophen products. *See* U.S. Food and Drug Administration, OTC Warning Letters, https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/ucm285283.htm#internal (last visited January 23, 2019). For example, one such warning letter accuses the manufacturer of misbranding because the aspirin tablets failed to meet the USP dissolution standard set for in the USP, in accordance with 21 CFR § 343.90(c), i.e., the 1988 TFM. FDA tested dissolution on a sample of "Aspirin Enteric Safety Coated Tablets." It failed to meet the USP dissolution specifications for delayed released tablets in accordance with 21 CFR § 343.90 (c), which states, "aspirin delayed-release tablets must meet the dissolution standard for…aspirin delayed-release tablets as contained in U.S.P, XXI Supplement 3 at page…1973." The product was misbranded under section 502(a) of the Act, *see* 21 U.S.C. § 352(a), because the tablets failed to meet the dissolution testing requirements. *See* Warning Letter, 2015-DET-17, American Family Pharmacy, LLC 7/30/15, https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2015/ucm470016.htm (last visited January 23, 2019)

---

[13] For example, "[u]nder Federal law, a drug with a name recognized in [USP] must comply with the current version of compendial standards deemed official by USP, or risk being deemed adulterated, misbranded, or both (FDCA 501(b) and 502(e)(3)(b); FDA regulations 21 CFR 299.5(a&b))."

(attached as Exhibit 4).   The warning letter threatened the following "legal action":

> You should take prompt action to correct the violations cited in this letter.  Failure to promptly correct these violations may result in legal action without further notice including, without limitation, seizure and injunction.  Other federal agencies may take this warning letter into account when considering the award of contracts.  Additionally, FDA may withhold approval of requests for export certificates, or approval of pending drug applications listing your facility, until the above violations are corrected.  A reinspection may be necessary.

*Id*.  Another FDA warning letter concerning acetaminophen tablets threatened a manufacturer with enforcement action for failing to include the warning required on the product label, and relied on the 1988 TFM as authority for the FDA taking legal action:

> Acetaminophen products are intended to be used as OTC internal analgesics and antipyretics.  When offered for these uses, acetaminophen is covered by FDA's OTC Drug Review, though it is not yet subject to a final OTC drug monograph.  *See* Tentative Final Monograph for Internal Analgesic, Antipyretic, and Antirheumatic Drug Products for Over-the-Counter Human Use, 53 Fed. Reg. 46204 (Nov. 16, 1988).  These acetaminophen products are misbranded under section 502(f)(2) of the Act (21 U.S.C. § 352 (f)(2)) because they do not bear all of the warnings presently required for OTC acetaminophen-containing drug products.

Warning Letter FLA-07-02, Direct Dispensing, Inc., 11/02/06, https://wayback.archive-it.org/7993/20170112201616/http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2006/ucm076153.htm (last visited January 23, 2019) (attached as Exhibit 5).

These enforcement actions demonstrate that FDA enforces its authority to regulate the labeling of OTC drugs, including with respect to dissolution standards.  FDA has established the rules for dissolution standards of immediate release tablets through regulations, a tentative final monograph that incorporates the USP dissolution standards, and through formal Guidance.  Any failure by Walgreens to comply with these FDA rules with respect to the labeling of the products would expose it to potential enforcement action by FDA.

15

e.  *FTC Enforces OTC Drug Advertising*

The Federal Trade Commission also promulgated standards for regulating "Advertising for Over-the-Counter Drugs."  46 Fed. Reg. 24584 (May 1, 1981).  In addition to setting out standards for advertising, the regulation directs that the FTC will bring an enforcement action "whenever necessary to insure the accuracy of OTC drug advertising … where appropriate, before a final FDA monograph is in place."  Id. at 24585.  The FTC has exercised this power and enforced its standards in cases where advertisements were actually misleading.  *See In re Thompson Medical Co.*, 104 F.T.C. 648 (1984) aff'd, 791 F.2d 189, 193 (D.C. Cir. 1986) ("The FTC has substantial expertise in evaluating claims of drugs' absolute and comparative efficacy, and in assessing whether advertisements are misleading or deceptive.").  Moreover, FTC has "special expertise" to determine "what sort of substantiation is necessary to assure that [OTC Drug] advertising is not deceptive."  791 F.2d at 194-96.  Further, FDA made its concerns regarding OTC drug advertising "known to the FTC" while the FDA regulated the drugs' labeling.  See 1988 TFM.  To the extent any claim concerning the labeling of the Walgreens Products could be made, it should be made by those Federal regulatory authority, not Plaintiff.

**B.  Plaintiffs' Claims Should Be Dismissed Under the Doctrine of Primary Jurisdiction.**

The Court should dismiss the FAC under the doctrine of primary jurisdiction because the central issue in this case—the meaning of the term "rapid release"—is within the regulatory authority and oversight of the FDA, the federal agency vested with jurisdiction over this issue. The primary jurisdiction doctrine is invoked by a court when it has "neither the facilities nor the expertise" that are required to determine whether a drug or label complies with FDA requirements.  *See Tutoki v. Celebrezze*, 375 F.2d 105, 107 (7th Cir. 1967) (affirming district court's determination of FDA primary jurisdiction regarding interstate shipment of a drug).

While Walgreens believes the FDA regulations and dissolution standards discussed above

16

are unambiguous, that the Walgreens Products comply with these standards, and Plaintiffs'
claims are preempted because they would require actions different to or in addition to what the
FDA has prescribed under section 379r, to the extent the Court were to disagree, it should
dismiss the FAC and defer to FDA to clarify or determine any such ambiguity in the regulations
and to take any enforcement action FDA believes appropriate under the doctrine of primary
jurisdiction. The use of the words "rapid release" based on dissolution time for acetaminophen
tablets or gelcaps should be left to FDA, and not to the courts. *See Tutoki*, 375 F.2d at 107.
Under the doctrine of primary jurisdiction, courts must defer to an administrative agency when
the issue involves technical considerations and is within the agency's discretion. *Id*. at n.2
(citing *Far East Conference v. United States*, 243 U.S. 570 at 574-75 (1952). A complex
dissolution rate is clearly within the technical realm, and under section 379r, the FDA has
discretion to regulate OTC drugs. If it is deemed not to have done so, the FDA should have the
opportunity to review the case "in the first instance," and consequently, the case should be
dismissed for lack of primary jurisdiction. *Id*.

      C.      **Plaintiffs Fail to State a Claim Under State Consumer Protection Statutes.**

Plaintiffs' ICFA, MMPA, and NYCFA claims should be dismissed for failure to state a
claim because Plaintiffs have not plausibly alleged the use of the words "rapid release" or "fast-
release" on the Walgreens Products labels is false, deceptive, or misleading. To avoid dismissal,
Plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This "context-
specific task … requires the reviewing court to draw on its judicial experience and common
sense." *Id.* at 679. Plaintiffs' claims cannot stand for the simple reason that labeling the product
as "Fast-Release" cannot plausibly be said to be false, deceptive, or misleading. In Illinois:

> there [a]re two types of false advertising claims: actual falsity and lack of
> substantiation. To prove a claim in the first category, a plaintiff must establish
> that the advertisement is actually false or misleading. To prove a claim in the
> second category, a plaintiff has a significantly lower burden: she need only show
> that the advertisement lacks scientific or other support.

*Spector v. Mondelez Int'l Inc.*, No. 15 C 4298, 2017 U.S. Dist. LEXIS 158140, *3-4 (N.D. Ill. Sept. 27, 2017) (internal citations omitted). As shown above, there is nothing false or misleading about the "Rapid Release" or "Fast-Release" statements on the Products' labels.

Additionally, "[i]n Illinois, a plaintiff may bring a lack of substantiation claim, but only 'when the [advertising] claim at issue implies there is substantiation for that claim, *i.e.*, if defendants had claimed something along the lines of "tests show that [the product in question] is [] effective."' *Id*. at *4, quoting *Gredell v. Wyeth Labs., Inc.*, 367 Ill. App. 3d 287 (Ill. App. 2006) (citing *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 939 n. 2 (7th Cir. 2001) ("lack of substantiation is deceptive only when the comparative claim at issue implies that there is substantiation for the claim made")). In *Spector*, the claim at issue was that a product provided "4 hours of nutritious steady energy." *Id*. at *5. This Court found this statement did not imply substantiation. *Id*. Moreover, the Court dismissed the ICFA claims because the plaintiff did not "allege any studies … which tested … the Defendant's Products … and concluded that either the Products or the [ingredients] in them do not produce the advertised result." *Id.* at *18.

Walgreens' statement on its label that its Products are "Rapid Release" or "Fast-Release" does not tout itself as substantiated, and does not make any comparative statements. Nor do Plaintiffs allege these claims are contradicted by the Study. "[A]llowing Plaintiff[s] to plead a false advertising claim without pleading facts that, if true, directly contradict Defendant's [Fast-Release] representation, would thwart the rule in Illinois that a plaintiff may bring a lack of substantiation claim only if the defendant makes a substantiation claim in its advertisement." *Id.* at *8. Otherwise, a plaintiff has no standing to bring such a claim.[14] *Id.* at *8-9. Moreover,

---

[14] Although Plaintiffs' FAC challenges the labeling of 15 Walgreens products (FAC, ¶ 51), Plaintiffs only allege purchasing or reviewing the labels of three (3) such products: Equate Extra Strength Acetaminophen Rapid Release Gelcaps in quantities of 24, 50, and 375. (FAC, ¶¶ 79, 87, 96, 104). No plaintiff alleges that he or she purchased Walgreens Extra Strength Pain Reliever Fast-Release Quick Gels in quantities of 100, 150, or 225. Nor does any Plaintiff allege that he or she bought *any* quantity of the following: Walgreens Extra Strength Pain Reliever PM Fast-Release Quick Gels; Well at Walgreens Daytime Non-Drowsy Sinus Congestion & Pain Acetaminophen Fast-Release Quick Gels; Well at Walgreens Tension Headache Relief Acetaminophen Quick Gels; or Well at Walgreens Extra Strength Headache Relief Acetaminophen Quick Gels. As such, Plaintiffs do not have standing to proceed with the products they have not purchased, and which labels Plaintiffs never reviewed. As a result, Walgreens

while the *Spector* plaintiff failed to identify a study which contradicted the seller's claim, Plaintiffs here actually cite a Study which in fact *does* substantiate the claim as it shows the Walgreens Products easily satisfy the FDA standard and guidance for rapid release.

Moreover, even if Plaintiffs *could* bring a lack of substantiation claim, and even if those claims *were* supported by allegations in the Complaint, this still would not be enough to satisfy Rule 9(b)'s more particularized pleading requirements for deception claims. "Without a factual predicate for the ineffectiveness of the Product formulation, that is, the alleged *inability* of the Product to provide the benefits *as stated on the Product label* … it is difficult to discern how [the "Fast-Release" statement] pleads the circumstances constituting fraud, as required by Rule 9(b)." *Spector*, at *26 (quoting *Hodges v. Vitamin Shoppe, Inc.*, 2014 U.S. Dist. LEXIS 5109, at *4 (D.N.J. Jan. 15, 2014) (emphasis added)). Moreover, Walgreens makes no comparative claim or superiority claim about the Products—the labels only say "Fast-Release" or "Rapid Release."

In a case with similar facts, *Bober v. Glaxo Wellcome Plc*, 246 F.3d 934 (7th Cir. 2001), the Seventh Circuit affirmed dismissal of a ILCFA claim alleging deceptive acts in marketing an over-the-counter medicine. The plaintiff in *Bober* alleged that certain statements made by the seller of Zantac products were deceptive and false. In analyzing whether the seller had made any false statements about the medications at issue, the Seventh Circuit confirmed that the only statements which had actually been made about the medication were in fact true. *Id.* at 939. Moreover, the Court explained that "[n]one of the statements [made by the seller] expressly makes" the claim the plaintiff alleged. *Id.* at 938. In addition, the plaintiff in *Bober* attempted to rest his claim upon an allegation that the statements at issue "imply" certain usage or characteristics of the product. *Id.* at 939-40. The Seventh Circuit viewed the actual statements, and found that they could not be read to imply something that was not on their face. *Id.* The Seventh Circuit found the veracity of the actual wording of the statements at issue was the

moves to strike the allegations from the FAC with respect to those products, pursuant to Rule 12(f).

critical focus for determining deception—not an imagined or "implied" statement thereabout.

The statements Walgreens *actually* made are as follows: (1) that the Products are "Rapid Release" and/or "Fast-Release"; and (2) that the Products have comparable active ingredients to Tylenol's medicines. (FAC, ¶¶ 6-7, 62-63.) Plaintiffs, however, have alleged that Walgreens implied or "suggested" that the Walgreens Products "worked faster than its other, cheaper, non-rapid release, non-fast-release, acetaminophen products." (*Id.* at ¶ 77.) But a review of the actual labels proves that none of the statements made by Walgreens expressly makes such a comparison. Rather, the only statement made by Walgreens which Plaintiffs allege to be false or misleading—that the Walgreens Products are "rapid release"—is true. *See Padilla v. Costco Wholesale Corp.*, No. 11 C 7686, 2013 U.S. Dist. LEXIS 7990 (N.D. Ill. Jan. 16, 2013) (dismissing ICFA claims where the plaintiff relied upon studies adducing facts the "product label does not claim").

Finally, while Walgreens' position is that the Walgreens Products labels' description of "fast-release" is unambiguously truthful and accurate, and in no way false or misleading, to the extent the Court were to find otherwise, it should still dismiss the FAC under the "mere puffery" doctrine. In *Smith-Victor Corp. v. Sylvania Electric Products, Inc.*, 242 F. Supp. 302 (N.D. Ill. 1965), this Court found that while *specific* claims such as "35,000 candle power and 10-hour life" are potentially actionable, "[a]dvertising which merely states in general terms that one product is superior is not actionable." *Id.* at 308-09. A general statement like "rapid release" would be nothing more than "puffery" under this Court's reasoning in *Smith-Victor*.

Plaintiffs' claims under the NY CFA are equally flawed. In *Naimi v. Starbucks Corp.*, LACV 17-6484 VAP (GJSx), 2018 U.S. Dist. LEXIS 110398 (C.D. Cal. June 27, 2018), a plaintiff sought to bring a class action under the NY CFA alleging the Starbucks "Doubleshot" beverage was false and misleading because it represented to consumers that each beverage contained at least two shots of espresso, but not every beverage contained two or more shots. *Id.* at *5-6. The court found that while the product was labeled a "Doubleshot," it "does not state

20

that it contains two shots of espresso" and the "Doubleshot" name does not "credibly denote a specific, measurable quantity of espresso content, let alone a quantity at all." *Id.* at *18-19. The court found that "[n]o reasonable consumer could be led to believe … the Product contains … a specific amount of Starbucks brand espresso." *Id.* at *24. In dismissing the case, the court noted it would be "impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Id.* at *22 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Here, Plaintiffs make similar allegations as in *Naimi*. Under the New York CFA, the statement on a product's label must "make [a] plausible affirmative representation about the Product's contents." *Id.* at *19. Given the actual statements on the Walgreens Products' labels, and because the Study cited in the FAC *confirms* the truth of that statement, it is not plausible that the term "rapid release" means "most rapid," or is in any way false or misleading.

Similarly, Plaintiffs' claims under the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010) (the "MMPA") must be dismissed. In *Baldwin v. Star Scientific, Inc.*, No. 14 C 588, 2016 U.S. Dist. LEXIS 11952 (N.D. Ill. Feb. 2, 2016), this Court dismissed claims under both the ICFA and the MMPA where the Plaintiffs alleged that the phrase "anti-inflammatory support" was false or misleading. In *Baldwin*, the plaintiff purported to rely on studies to support his claims, but this Court was unpersuaded, finding that for claims under both the ICFA and MMPA, a plaintiff "must do more than cite [a study] that tends to *support* Defendants' representations." *Id*. at 30. Rather, the plaintiff was required to provide studies and other evidence *proving* that the anti-inflammatory qualities were *false*. *Id.* Because the plaintiff could not do so, his claims under the ICFA and MMPA were dismissed. *Id.* at 31.

Beyond failing to state a claim under Rule 12(b)(6), the FAC fails to satisfy the heightened pleading standard of Rule 9(b). As noted above, in determining whether a complaint satisfies Rule 9(b), the Court must focus on the text of the labels themselves. A plaintiff must prove more than just the "who, what, where, when, and how," as Rule 9(b) "requires that the alleged facts show that fraud is 'necessary or probable inference' from those facts." *Spector*,

2017 U.S. Dist. LEXIS at *3 (quoting *People ex rel. Hartigan v. E. & E. Hauling, Inc.,* 153 Ill. 2d 473 (Ill. 1992)). When the plaintiff in *Spector* pointed only to the label itself and studies which failed to disprove those claims, this Court dismissed the complaint for failure to specify what specifically was fraudulent about the actual labels.

While Plaintiffs point to "Walgreens representations that the [Walgreens Products] work faster than its non-fast-release products," (FAC, ¶ 74), nowhere in these allegations, nor elsewhere in the FAC, do Plaintiffs cite to a statement on the labels or other marketing regarding the Walgreens Products working "faster" than another product. Nor do Plaintiffs suggest their addition of these words would be the "necessary" or even "probable" reading, particularly when they only adduce the Study, which proves the label is accurate.

For these reasons, the FAC fails to meet the pleading requirements of Rules 12(b)(6) and 9(b), and must be dismissed.

### D. Illinois's Safe Harbor Doctrine Bars Plaintiffs' Claims

Plaintiffs' claims under the ICFA also are barred as a matter of law by the Illinois safe harbor doctrine because Walgreens has complied with the FDA's regulatory scheme for using the words "rapid release" or "fast-release" on the package labeling for Walgreens Products.

The ICFA excludes from liability "actions … specifically authorized by laws administered by any regulatory body or offices acting under statutory authority of this State or the United States." 815 Ill. Comp. Stat. 505/10b(1). In *Bober,* the Seventh Circuit ruled that if a party is in compliance with federal regulations, "section 10b(1) will protect them from liability under the CFA." *Bober,* 246 F.3d at 941. Importantly, "specifically authorized" does not mean the FDA must bless the exact product at issue. *Id.* The court reviewed the relevant FDA materials to conclude "[t]here is no dispute" that the drug satisfied the FDA's definition of a new drug, and was therefore specifically authorized to use that language in its marketing and labeling

materials. *Id.* This was so, "even if the statement may have led [the plaintiff] as a layperson to misunderstand what was being said." *Id.* at 941-42 *citing Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.*, 713 N.E.2d 543, at 550 (Ill. 1999). Looking to the overall regulatory regime of medications, the Seventh Circuit concluded that while some consumer confusion might be possible, this does not create a private right of action. The Seventh Circuit summarized:

> Technical requirements abound, and it is not only possible but likely that ordinary consumers will find some of them confusing, or possibly misleading as the term is used in statutes like Illinois's CFA. But, recognizing the primacy of federal law in this field, the Illinois statute itself protects companies from liability if their actions are authorized by federal law. (Such protection would amount to nothing if it applied only to statements that were not susceptible to misunderstanding; those statements would escape liability under the CFA in any event.)

*Id.* at 942-43.

Here, the Walgreens Products fall squarely within the FDA requirements for a "rapid release" product according to FDA guidance and regulations. Because the Walgreens Products meet the FDA's requirements, the Illinois safe harbor doctrine bars Plaintiffs' ICFA claims.

### E. Plaintiffs Fail to State a Claim for Breach of Implied and Express Warranty.

Plaintiffs' claims for breach of warranty must be dismissed because the FAC does not plausibly allege that Walgreens breached any warranty with regards to the Walgreens Products. Plaintiffs' claim for breach of implied warranty of merchantability under the UCC is based on the allegation that the Walgreens Products violate an implied warranty "in that the Class Rapid Release Gelcaps do not rapid release [sic] or provide rapid relief faster than cheaper, non-rapid release acetaminophen Walgreens products." (FAC, ¶¶ 142, 153.)

UCC § 2-314(2) requires goods "[c]onform to the promises or affirmations of fact made on the container or label if any." An action for breach of warranty under the UCC is confined to the words expressly used by a seller, not an individual's perception. *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 926-27 (N.D. Ill. Aug.

23

24, 2017). In *Parmesan Cheese*, the plaintiffs alleged that a product violated the implied warranty of merchantability because its label said "100% parmesan cheese," but it contained additional ingredients. This Court found the labels "make no promise that the product consists of cheese only," and thus held that the implied warranty claims failed. *Id.* Since the product was "fit for ordinary use," this was enough for an implied warranty of merchantability. *Id.*

The Walgreens Products conform to the statements on the label. The only statements at issue are "Rapid Release" or "Fast-Release." Contrary to Plaintiffs' allegation, the Walgreens Products are "Rapid Release" by controlling FDA standards. Plaintiffs' allegation that the Walgreens Products may not dissolve as quickly as certain other products is irrelevant for purposes of this claim, because such comparative language never appears on the label at all.

Moreover, Plaintiffs have not alleged any defects in the Walgreens Products which might affect their fitness of use. The purpose of the implied warranty of merchantability is not to permit a consumer or a plaintiff to infer qualities about the product which are not actually warranted. Such a rule would permit endless lawsuits. Rather, a seller is only responsible for those explicit promises it made regarding its products. Here, Walgreens delivered on the promise of rapid release. Accordingly, Plaintiffs' claims for breach of implied warranty fail.

Plaintiffs' claim for breach of express warranty is equally flawed. In Illinois, "[a]n express warranty is a 'creature of contract'" and cannot simply exist by way of purchasing a product. *Miller v. Showcase Homes, Inc.*, No. 98 C 2009, 1999 U.S. Dist. LEXIS 4748, *23-24 (N.D. Ill. 1999). Where a plaintiff fails to allege that a seller made a written or oral promise to provide a warranty for a product, such a claim is, "at best, a claim of implied warranty." *Id.* at *24. Here, Plaintiffs fail to allege any affirmations or promises outside of the labels themselves.

Finally, Plaintiffs' Magnusson-Moss Warranty Act (MMWA) claims must also be dismissed. Having shown there is no basis for a claim under any state law claim or otherwise, the law is clear that "[a] claim under the Magnuson-Moss Warranty Act depends on the existence of a viable underlying state law warranty claim." *Schiesser v. Ford Motor Co.*, No. 16 C 730,

2017 U.S. Dist. LEXIS 53180, *10 (N.D. Ill. Apr. 6, 2017) (citing *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 315 (S.D. Ill. 2007)). These derivative claims must therefore also fail. Plaintiffs' MMWA claims also fail because a label, without something more, is not a warranty. *Bowling v. Johnson & Johnson*, 65 F. Supp. 3d 371, 377-378 (S.D.N.Y. 2014) (holding "Restores Enamel" statement on mouthwash label was not actionable under MMWA).

### F. Plaintiffs' Remaining Claims Must Also Be Dismissed

Finally, Plaintiffs' claims for Unjust Enrichment and Declaratory Relief must also fail. In Illinois, "unjust enrichment is not a separate cause of action." *Aliano v. Fifth Generation, Inc.*, No. 14 C 10086, 2015 U.S. Dist. LEXIS 128104 at *12 (N.D. Ill. Sept. 24, 2015) (internal marks omitted) (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011)). A plaintiff's unjust enrichment claim "will stand or fall" with related claims based on "the same [alleged] improper conduct." *Cleary v. Phillips Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). So too, "[w]here a claim for declaratory judgment presents the same issues as the remaining substantive claims, it serves no useful purpose and should be dismissed." *Classic Bus. Corp. v. Equilon Enters., LLC*, No. 09 C 7735, 2011 U.S. Dist. LEXIS 7817, *14 (N.D. Ill. Jan. 27, 2011). Plaintiffs' unjust enrichment and declaratory judgment claims are derivative and duplicative of their remaining claims, and rest upon the same set of flawed premises, and therefore must be dismissed.

## V. CONCLUSION

For the foregoing reasons, this Court should dismiss the FAC in its entirety, with prejudice. Any request by Plaintiffs to file an amended complaint should be denied, as re-pleading cannot cure the deficiencies of the FAC. *See, e.g., Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2015 U.S. Dist. LEXIS 15553, *55 (N.D. Ill. Feb. 9, 2015) (denying leave to amend when such amendment would be futile).

Therefore, Walgreens respectfully requests this Court DISMISS the FAC with prejudice.

DATED:  February 5, 2019        **FOLEY & LARDNER LLP**

By: */s/ Peter J. O'Meara* 
Peter J. O'Meara
Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60654-5313
Tel:     (312) 832-4914
Fax:     (312) 832-4700
pomeara@foley.com

Jay N. Varon (admitted *pro hac vice*)
David L. Rosen (*pro hac vice motion to be submitted*)
David A. Hickerson (*pro hac vice motion to be submitted*)
Jarren N. Ginsburg (*pro hac vice motion to be submitted*)
Foley & Lardner LLP
3000 K Street, N.W.
Suite 600
Washington, D.C. 20007-5109
Tel:     (202) 672-5380
Fax:     (202) 672-5399
jvaron@foley.com
dhickerson@foley.com
drosen@foley.com
jginsburg@foley.com

*Attorneys for Defendant Walgreens Boots Alliance, Inc.*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Memorandum in Support of Motion to Dismiss First Amended Class Action Complaint was served on February 5, 2019, via the Court's ECF system, which will send an electronic copy to all counsel of record.

<u>/s/ *Peter J. O'Meara*</u>
Peter J. O'Meara